IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SARENS USA, INC.,<br><br>               Plaintiff,<br><br>vs.<br><br>AMY LOWERY,<br><br>               Defendant. | Lead Case No.<br>CV 20–47–M–DWM<br><br>Member Case No.<br>CV 20–60–M–DWM<br><br>ORDER |

This administrative review case stems from claims Amy Lowery brought against her former employer, Sarens USA, Inc. for hostile work environment, discriminatory discharge, and retaliation. The Office of Administration Hearings sustained Lowery's hostile work environment claim and awarded $50,000 in emotional distress damages. The parties cross-appealed to the Montana Human Rights Commission, which affirmed. They now seek judicial review. Following briefing and oral argument, the agency decision is affirmed.

## BACKGROUND

The facts are primarily taken from the January 2019 contested hearing and the Hearing Officer's Decision ("HOD"). The relevant actors include:

| Name | Position | Hearing Testimony |
|---|---|---|
| **Human Resources** | | |
| Machteld Leybaert | Global HR Manager, Belgium | None |
| Alicia Thomas | HR Manager, Houston (until Nov. 2017) | None |

1

| Sheryl Rademacher | HR Manager, Houston (Nov. 2017 - July 2018) | Deposition |
|---|---|---|
| **Management** | | |
| Mike Hussey | Regional Director for US, Canada, & Mexico | Video (& deposition) |
| Mark Watson | Country Manager for the US, Houston | Deposition |
| Guus Stigter | Sales and Marketing Manager | None |
| Kleopatra Kyrimi | Global Group Marketing Director, Madrid | None |
| **Houston Employees** | | |
| Rafael Boza | Regional Legal Counsel | Live (& deposition) |
| Aaron Perzan | Contracts Manager | Deposition |
| Frido DeGreef | Fleet and Operations Manager | Deposition |
| **Missoula Employees** | | |
| Amy Lowery | Regional Marketing Manager | Live (& deposition) |
| Brian Eggert | Regional IT Manager | Live |
| Steven Koski | Engineer | None |
| **Other** | | |
| Sarah Lowery | Amy Lowery's Sister | Live |

## I.    Lowery's Employment

Sarens is the world's second largest crane company and is based out of

Belgium.  (HOD at 2; Hearing Tr. at 242 (Hussey), 276 (Boza).)  Its North

American operations are based out of Houston, Texas, and it acquired an office in

Missoula, Montana when it purchased Rigging International in 2009.  (HOD at 2.)

In November 2014, Sarens hired Lowery to work in the Missoula office as a

regional marketing manager.  (*Id.* at 3.)  Lowery is female and identifies as gay.

(*Id.* at 2.)  In her position, Lowery was responsible for marketing efforts for the

United States and Canada.  (*Id.* at 3.)  She also prepared prequalification and

proposal packages.  (*Id.*)  In March 2017, Lowery received a positive performance

evaluation. (Ex. 25.) She reported to Guus Stigter and had a "dotted-line" reporting line to Kleopatra Kyrimi. (HOD at 3.)

In July 2016, Mark Watson became Sarens' Country Manager for the United States. (*Id.* at 4.) Based in Houston, Watson was responsible for overseeing all United States operations, including the human resources department, operations, and equipment. (*Id.*) Stigter reported directly to Watson, who in turn reported to Mike Hussey. (*Id.*) As part of his employment, Watson traveled to the Missoula office five or so times while Lowery worked there. (*Id.* at 6.) During that same time, Lowery traveled to Houston four or five times. (*Id.*) The two also spoke frequently on the telephone. (*Id.*)

## II.     The Harassment

In 2017, Watson began making sexual and inappropriate comments to Lowery that made her uncomfortable. (*Id.*) Watson was aware of Lowery's sexual orientation. (*Id.* at 5; Watson Depo. at 12.) At a retirement party in Missoula in January 2017, Watson began talking to Lowery about a female co-worker's bottom, saying that "her ass was big" and asking if that was Lowery's "type." (HOD at 6; Hearing Tr. at 54 (Lowery).) Watson then told Lowery that his previous employer had purchased a higher insurance policy because of Watson's sexual harassment. (*Id.*) On another occasion, Watson asked Lowery to meet him at the Buffalo Wild Wings when his flight got in Missoula late at night. (HOD at

3

7.)  She assumed they were going to discuss business, but instead Watson flirted with their young waitress and, after she left the table, insinuated a threesome.  (*Id.*)

Once when he was at Lowery's office, Watson told Lowery that she had "great breasts."  (*Id.* at 8; Hearing Tr. at 60 (Lowery).)  On another occasion he told her that she had lost weight and that her "ass was looking good."  (Hearing Tr. at 60 (Lowery).)  Watson frequently spoke to Lowery about picking up women, asking her if there were any good "dyke bars" in Missoula and referring to her as a "dyke" to another co-worker.  (HOD at 8; Perzan Depo. at 11.)  Watson frequently asked Lowery when they spoke on the phone if she was "getting laid" or made similar comments.  (HOD at 8.)  In July 2017, Lowery was away from work recovering from surgery and Watson called.  (HOD at 7.)  He said that "he's usually trying to get [Lowery] and girls into bed and not out of bed."  (*Id.*; Hearing Tr. at 61 (Lowery).)  Lowery was disgusted and confided in her sister about his comment.  (HOD at 7; Hearing Tr. at 186 (Sarah).)  She also reported Watson's comments to Brian Eggert.  (HOD at 7.)

Lowery did not respond when Watson made the comments described above.  (Hearing Tr. at 62 (Lowery).)  When asked later why she did not do so, Lowery explained that she felt weak and ashamed, (*id.* at 56, 62), and she did not think the company would take any corrective steps, (*id.* at 85).  While Lowery had generally enjoyed her job, her feelings changed in light of Watson's harassment and she

4

altered her work to avoid him.  (*Id.* at 69.)  And, in May 2017, she constructively rejected a pay raise and relocation offer because it would mean working more closely with Watson.  (*Id.* at 45–46; HOD at 5–6.)

Watson's inappropriate behavior extended beyond his interactions with Lowery.  For example, he made inappropriate comments about a female vendor's appearance and outfit, (DeGreef Depo. at 9–10); and he made a lewd comment to a waitress at a lunch in Houston with a co-worker, (HOD at 7; Hearing Tr. at 206–07 (Eggert)).  He also made sexualized comments about women to other coworkers, such as "would you give it to her?" or "would you give her a go?"  (Perzan Depo. at 6–7.)  His behavior was pervasive enough that he was referred to as the "sex pest" by other employees.  (*Id.* at 8.)  He was also the subject of an internal sexual harassment inquiry in July 2017.  (Ex. 20.)  That investigation validated one of four allegations of harassment and recommended a written reprimand and sexual harassment training.  (*Id.*)  Management decided instead to issue only a verbal reprimand, (*id.*), which Watson "refused to accept," (Watson Depo. at 34).

In October 2017, Lowery traveled to Houston to attend the Breakbulk Americas Conference.  (HOD at 8.)  At the conference, several Sarens employees witnessed inappropriate comments made by Watson.  (Hearing Tr. at 70–73 (Lowery); DeGreef Depo. at 8.)  For example, Watson said to Lowery—while staring at her chest—that she should button her shirt a higher, "unless that's what

you're going for, because that's right where my eyes are going."  (HOD at 8;
Hearing Tr. at 66 (Lowery).)  Watson also catcalled women as they walked by the
booth, saying "You know what my type is? Anything with a pulse," while
pantomiming kicking a corpse.  (HOD at 9; Hearing Tr. at 64 (Lowery).) Watson
told one passerby she had missed a belt loop and then said, "I could help you re-
dress."  (HOD at 9; Hearing Tr. at 64–65 (Lowery).)  Watson badgered her until
the woman turned to Lowery and asked, "and you have to work with this guy?"
and said, "Oh my God, where is the Stop Button on this guy?!"  (*Id.*)  Lowery,
embarrassed, replied, "We're still trying to find it."  (*Id.*)  Watson repeatedly asked
Lowery, "would you do her?" as one woman walked by.  (HOD at 8; DeGreef
Depo. at 6.)  Watson also asked Lowery to walk the floor, continuing to make
inappropriate remarks.  (HOD at 8.)  Watson also pressured Lowery to move to
Houston, telling her that there were "more girls" for her there.  (Hearing Tr. at 48
(Lowery).)  Finally, while Watson and Lowery drove to pick up some clients for
dinner, Watson told Lowery that Sarens had just settled a sexual harassment
lawsuit and that he had refused to be reprimanded for his role in it.  (HOD at 9.)

## III.    The "Investigation"

After the conference, Frido DeGreef reported Watson's inappropriate
behavior to Alicia Thomas.  (*Id.*)  Although DeGreef described Watson's behavior
as "inappropriate and unprofessional," he declined to make a formal complaint

because he was unsure of the relationship between Watson and Lowery. (HOD at 9–10.) A few days later, Stigter contacted Lowery to discuss Watson's conduct. (*Id.* at 10.) Lowery reported that she thought Watson had made inappropriate comments to other women and had made an inappropriate comment to her about buttoning her blouse. (*Id.*) She also described Watson's behavior over the preceding months, (*id.*), and explained that she had not reported it because she did not think it would change anything, (Hearing Tr. at 70–71 (Lowery)). In response, Stigter said, "Yeah. I can understand." (*Id.* at 71.)

Within a few days, Thomas contacted Lowery and informed Lowery that she was investigating the claims. (HOD at 10.) Lowery shared the same information with Thomas as she had with Stigter. (*Id.*) Thomas did not tell Lowery to prepare a written complaint, (*id.*), but stated that she would continue to investigate, (*id.* at 11). Thomas also reported Watson's behavior and Lowery's involvement to Hussey but did not disclose the specifics. (*Id.* at 12.) On October 26, Thomas sent Hussey and Machteld Leybaert an email stating that there had been a report of inappropriate behavior by Watson "and a few others" but there had not been a "formal complaint" and asked if they would like her to investigate further. (*Id.*; Ex. 21.) Leybaert responded that Thomas should make a note in Watson's file and proceed with sexual harassment training. (*Id.*)

In the meantime, Lowery heard nothing back from Thomas so called to follow up. (HOD at 11.) Thomas reassured Lowery that she was not in trouble for reporting Watson's conduct and she did not need to do anything further. (*Id.*) Watson maintains that he never knew of Lowery's complaint, (*id.*; Watson Depo. at 15), but Lowery believed he knew because when he visited the Missoula office in early November 2017, he acted differently and did not approach her, (HOD at 15). During that visit, Watson informed everyone that Thomas had resigned. (*Id.* at 12, 15.) She was replaced by Sheryl Rademacher. (Rademacher Depo. at 5.) Rademacher knew that Lowery had made a complaint against Watson but was not aware of the details and believed the investigation had concluded by the time she assumed Thomas' position. (*Id.* at 16, 22–24; HOD at 12.)

## IV.   Lowery's Termination

Hurricane Harvey destroyed Sarens' Houston office in August of 2017, exacerbating Sarens' financial difficulties and prompting senior management to reduce its North American workforce. (HOD at 13; Hearing Tr. at 243–44 (Hussey), 287 (Boza).) Multiple employees were subsequently laid off, including Lowery and two other Missoula employees, Eggert and Stephen Koski. (HOD at 15; Hearing Tr. at 252 (Hussey).) The official reason for Lowery's termination was to "reduce work force." (Ex. 32.) Lowery maintains, however, that she was terminated because of her complaint against Watson.

8

Although it is undisputed that Watson personally signed and delivered her termination letter on November 28, 2017, (Ex. 32; Hearing Tr. 90–91 (Lowery)), the parties dispute Watson's involvement in the termination decision.  According to Hussey, he and Watson discussed layoffs in October 2017, but Lowery never came up even though Watson created a list of potential layoffs.  (HOD at 13; Hearing Tr. at 247, 256–58 (Hussey).)  In Lowery's case, Hussey contends that he attended a regional management meeting after which he and Leybaert decided Lowery could be terminated based on the "redundancy" of her marketing position.  (HOD at 13; Hearing Tr. at 243–46, 263, 273 (Hussey).)  Only after the decision was made was Watson informed during a November 21 conference call and told to move forward with the paperwork and termination.  (HOD at 14; Hearing Tr. at 246 (Hussey); Watson Depo. at 16–17.)  Neither of Lowery's supervisors—Stigter or Kyrimi—were part of the decision.  (HOD at 13.)  But Hussey admitted that he was aware of Lowery's complaint at the time he made the layoff decision.  (*Id.*; Hearing Tr. at 263–65 (Hussey).)  And Watson asked Rademacher to prepare the termination paperwork.  (HOD at 14.)  Rademacher recalled that Watson appeared "giddy" at the prospect of terminating Lowery and "grinned" while referring to her as a "fucking pussy-loving bitch."  (*Id.*; Rademacher Depo. at 9.)  Although Rademacher did not report Watson's comment to anyone, (Rademacher Depo. at 16), she did recommend to Hussey that Watson not be the one to terminate

9

Lowery, (HOD at 14).  Rademacher also noticed that, contrary to management's

instruction, Watson's file did not contain a "note" on Lowery's complaint.  (*Id.*)

Sarens terminated Watson on December 19, 2017.  (Ex. 13; HOD at 15.)

Though the official reason was "not being satisfied with development of the

business unit," (Ex. 13), Hussey indicated the decision was also based on concerns

regarding the work environment, (Hearing Tr. at 267 (Hussey)).  (HOD at 15.)

## V.    Lowery's Complaint

On December 11, 2017, Lowery filed a complaint against Sarens with the

Montana Human Rights Bureau, alleging that Watson's behavior created a hostile

work environment that discriminated against her because of her sex and sexual

orientation.  She further alleged that her termination was discriminatory and in

retaliation for her complaint.  A contested hearing was held on January 29 and 30,

2019, in Missoula, Montana before Hearing Officer Caroline Holien of the Officer

of Administrative Hearings, Centralized Services Division, Montana Department

of Labor and Industry.  Lowery sought damages in the amount of $259,771, which

included back pay with interest, front pay, and emotional distress.

The Hearing Officer concluded that Lowery was credible and Watson was

not, at least in part because Watson denied engaging in any inappropriate behavior

at any time.  (HOD at 17–18; *see* Watson Depo. at 9–10, 13–15, 23–24, 25, 31.)

The Hearing Officer issued her decision on September 20, 2019, granting judgment

10

in favor of Lowery on the grounds that Lowery had been subjected to a hostile

work environment and awarding $50,000 in emotional distress damages. (HOD at

41–42.) She also ordered Sarens to develop new harassment policies and consult

with the Human Rights Bureau to prevent further discrimination. (*Id.*) However,

the Hearing Officer determined that Lowery's termination was not related to

Watson or her complaint and therefore did not award any lost wages. (*Id.* at 39.)

Both parties sought review by the Montana Human Rights Commission. The

Commission heard oral argument on January 24, 2020. It affirmed the Hearing

Officer's Decision in a Final Agency Decision dated February 13, 2020.

Two petitions for review are at issue. First, on March 10, Lowery filed her

petition in the Montana First Judicial District Court, Lewis and Clark County,

claiming that the Hearing Officer erred in rejecting her retaliation claim and not

awarding the full amount of damages. That petition was removed to this Court as

CV 20–25–H–SEH (later CV 20–60–M–DWM). Second, on March 11, Sarens

filed its petition in the Montana Fourth Judicial District Court, Missoula County,

seeking a reversal of the hostile work environment decision. That petition was

removed to this Court as CV 20–47–M–DWM. Lowery's petition was

subsequently transferred to the Missoula Division, and the cases were

consolidated. (*See* Doc. 7.) Citations refer to the lead case, CV 20–47–M–DWM.

## LEGAL STANDARD

"A district court reviews an administrative decision in a contested case to determine whether the findings of fact are clearly erroneous and whether the agency correctly applied the law." *Laudert v. Richland Cty. Sheriff's Dep't*, 7 P.3d 386, 389 (Mont. 2000). "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the trier of fact misapprehended the effect of the evidence, or if the record leaves the reviewing court with a definite and firm conviction that a mistake has been made." *Puskas v. Pine Hills Youth Corr. Fac.*, 307 P.3d 298, 303 (Mont. 2013). The court's review is "confined to the record" and "[t]he court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of facts." Mont. Code Ann. § 2–4–704(1), (2). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. It consists of more than a mere scintilla of evidence but may be less than a preponderance." *Blaine Cty. v. Stricker*, 394 P.3d 159, 163 (Mont. 2017) (internal quotation marks and alteration omitted). The court views the evidence in the light most favorable to the prevailing party. *Id.*

## ANALYSIS

Neither party has effectively overcome the deferential standard of review that applies here. While the record does not support some of Lowery's assertions of fact or Sarens' attempt to downplay Watson's conduct, there is substantial

12

evidence to support the Hearing Officer's decision to both sustain Lowery's hostile work environment claim and reject her claim regarding retaliation. Thus, even if this Court were inclined to decide differently in the first instance, the agency's decision is affirmed.

## I.     Sarens' Appeal

Sarens' appeal focuses on Lowery's hostile work environment claim. Sarens argues that Lowery failed to meet the prima facie requirements and that even if she had, Sarens is not liable. Neither position is compelling.

### A.     Hostile Work Environment

To establish a prima facie case of hostile work environment, Lowery was required to show that (1) she is a member of a protected class; (2) she was subjected to offensive conduct that amounted to actual discrimination because of sex; (3) the conduct was unwelcome; and (4) the sexual harassment was so severe or pervasive so as to alter the conditions of employment and create an abusive working environment. *Campbell v. Garden City Plumbing & Heating, Inc.*, 97 P.3d 546, 550–51 (Mont. 2004); *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 798 (9th Cir. 2003). Only (3) and (4) are disputed here.[1]

---

[1] Sarens attempts to undercut Lowery's case based on discrimination she may have experienced because of her "sexual orientation" as opposed to her "sex." But even if this had not been addressed by the Hearing Officer, (HOD at 18–20), discrimination based on sexual orientation is sex discrimination, *see Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020).

### 1.   Hearing Officer's Standard

As a preliminary matter, the Hearing Officer improperly described this as a "direct evidence case" and cited the burden-shifting standard that applies to disparate treatment cases.  (*See* HOD at 22, 24, 25.)  Sarens argues that this was a misapplication of the standard of review and constitutes reversible error.  The Commission, however, determined that despite this language, the Hearing Officer applied the correct hostile work environment framework and analyzed the facts under that standard.  (*See* Oral Arg., Final Agency Decision at 4 n.2.)  Accordingly, the Commission determined that the "direct evidence" language could be excised from the decision without undercutting the Hearing Officer's final analysis or conclusion.  That determination is correct.  Though she cited the incorrect standard, the Hearing Officer determined that Lowery established the same elements of a prima facie case cited by Sarens in this appeal.  In doing so, the Hearing Officer properly placed the burden on Lowery to prove her case and on Sarens to prove its affirmative defense.  This challenge is therefore rejected.

### 2.   Unwelcomeness

To succeed on her hostile work environment claim, Lowery was required to show that Watson's conduct was unwelcome.  *Campbell*, 97 P.3d at 550.  The Hearing Officer found that: "Sarens is correct there is no evidence showing Lowery told Watson that she did not welcome his comments about her appearance

or suggestions as to whom she should approach for an illicit tryst." (HOD at 25.)
Nor did Lowery report Watson's conduct or comments until after the Breakbulk
Conference in October 2017. (Hearing Tr. at 80 (Lowery).) Nonetheless, the
Hearing Officer concluded that the unwelcomeness of Watson's conduct could be
inferred because Lowery did not respond positively or encourage him, and in the
limited instance observed by a third party, Lowery "was not receptive" and
"appeared uncomfortable with his comments and suggestions." (HOD at 25.)

Sarens challenges this conclusion on the grounds that "unwelcomeness has
to be communicated." *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998
(9th Cir. 2010). Yet neither an explicit objection nor a direct report to the
employer is required to meet this standard. To the contrary, in the same breath that
the court states the above, it goes on to state: "past conduct of the individuals and
the surrounding circumstances may suggest that conduct claimed to be unwelcome
was merely part of a continuing course of conduct that had been welcomed warmly
until some promotion was denied or employment was terminated. That is a
credibility issue." *Id.* (footnote omitted). Thus, determining "welcomeness" or
"unwelcomeness" requires a consideration of all the facts and circumstances of the
parties' interactions and relationship. Here, the record supports the Hearing
Officer's determination that Lowery was not receptive to nor instigated any of the

boorish behavior.  And while Sarens is free to argue its case, to say that Watson's conduct could be perceived as "welcome" based on this record strains credulity.

### 3. Severe or Pervasive

Sarens further argues that Lowery failed to show that Watson's harassment was sufficiently severe or pervasive as to alter the terms or conditions of her employment.  That argument is also unpersuasive.

Sarens first argues that the Hearing Officer relied too heavily on Lowery's subjective beliefs as opposed as to the objective standard for "severe" or "pervasive" conduct.  "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001).  "All the circumstances" includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

The Hearing Officer did not clearly err in concluding that a reasonable woman would have found Watson's sustained campaign of boorish commentary

16

sufficiently severe or pervasive as to alter the terms and conditions of employment. (HOD at 22.)  Even though Lowery and Watson were in different offices, their interactions involved regular contact.  Weekly or even monthly inquiries into one's sexual conquests compounded by cat-calling women on a regular basis sets this case apart from those with limited interaction between the employees, *see Swenson v. Potter*, 271 F.3d 1184, 1195–96 (9th Cir. 2001) (finding no hostile work environment where almost none of plaintiff's 16 encounters with a coworker involved speech or physical contact), or those where comments were made during a single incident, *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (offensive comments "were mainly made in a flurry" on a single date).

Moreover, Watson's inappropriate conduct was sufficiently pervasive that he was previously investigated for sexual harassment, (*see* Ex. 20), and his male coworkers referred to him as the "sex pest," (Perzan Depo. at 8).  And more than one coworker reported being present while Watson made inappropriate comments to or about women.  (*See* Hearing Tr. at 206–07 (Eggert); DeGreef Depo. at 9–10; Perzan Depo. at 6–8; Rademacher Depo. at 9–11; Hearing Tr. at 280 (Boza discussing Watson's comments made in previous complaint).)  Thus, defense counsel's belief that Watson's conduct was not sufficiently offensive as to be objectively pervasive is belied by the record.

Sarens further argues that regardless of Lowery's subjective view of the harassment, she admitted that Watson's behavior did not alter the terms or conditions of her employment because she continued to do her job and enjoy it. But Sarens ignores evidence that Lowery did change her work behavior because of Watson. For example, Lowery testified that she would avoid bringing things to him directly and would try to work around him. (Hearing Tr. at 63, 69 (Lowery).) Lowery also constructively rejected a pay raise and transfer to the Houston office to avoid him. (*Id.* at 45–46.) Lowery, who the Hearing Officer found credible, also described her mood and behavior change. (*Id.* at 69.) While Sarens can point to evidence in the record that shows Lowery continued to work with Watson, (*see e.g.*, Hearing Tr. at 177 (Lowery agreed to meet him at Buffalo Wild Wings)), that is not sufficient to undermine the Hearing Officer's findings.

### 4.   Conclusion

The Hearing Officer did not clearly err in finding that Lowery was subjected to a hostile work environment.

### B.   Liability

But Sarens maintains that it cannot be held liable for Watson's harassment because he was not Lowery's supervisor and, even if he was, the company exercised reasonable care to prevent and correct any sexually harassing behavior. This argument also fails.

18

### 1.    Supervisor

An employer is generally liable if a hostile work environment is created by a supervisor. *Faragher*, 524 U.S. at 807–08.  Sarens argues that Watson was not Lowery's supervisor because she did not report to him.  It is undisputed, however, that Lowery reported to Stigter, (HOD at 3; Hearing Tr. at 242 (Hussey)), who in turn reported to Watson, (Hearing Tr. at 36 (Lowery)).  According to the Supreme Court, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807–08; *see also Stringer-Altmaier v. Haffner*, 138 P.3d 419, 423 (Mont. 2006).  Because Watson was "successively higher" in Lowery's chain of command, he was her "supervisor" for the purposes of this claim.

### 2.    Affirmative Defense

Nonetheless, Sarens maintains that because Watson's harassment did not culminate in any tangible employment action against Lowery (*see infra*), it is entitled to the *Ellerth-Faragher* affirmative defense. *See Faragher*, 524 U.S. at 807–08; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 724, 765 (1998).  To succeed on this defense, an employer must show (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) that the "employee unreasonably failed to take advantage of any preventative or corrective

opportunities provided by the employer to avoid harm otherwise." *Faragher*, 524 U.S. at 807.  Sarens has shown neither.

Sarens first argues that it exercised reasonable care in that it enforced its anti-harassment policy, and it promptly and thoroughly investigated harassment complaints once made.  Neither assertion is supported by the record.  First, while it is undisputed that Sarens had an anti-harassment policy in place at the time, (*see* Hearing Tr. at 276 (Boza); Ex. 1 (Employee Handbook)), the internal investigation from another Watson-related sexual harassment claim recommended that the company update and clarify the policy.  (Ex. 20 at 14.)  That never happened. (Hearing Tr. at 303–04 (Boza).)

As to Sarens' second point, the company's track record for harassment complaints against Watson was not particularly compelling.  Sarens argues that it effectively and efficiently investigated a harassment complaint made by an employee in the Houston office against Watson and another employee that resulted in disciplinary action.  However, through an internal report, the company sustained only one of the four allegations (the only allegation that happened to be witnessed by a third party).  (Ex. 20 at 11–14.)  And, the internal report recommended Sarens take numerous steps in response to the complaint, including issuing a written reprimand of Watson, updating the company's harassment policy, and mandating sexual harassment and gender sensitivity training.  (*Id.* at 14.)  Even though that

20

report was issued in July 2017, not one of those things happened by the time Lowery was terminated. (*See* Hearing Tr. at 302–04 (Boza).) In fact, higher management decided only a verbal reprimand was warranted, (*id.* at 279), which Watson apparently "rejected," (Watson Depo. at 34; Hearing Tr. at 302 (Boza stating that Watson's lack of acceptance was a "red flag").

As it relates to Lowery's complaint, the company did immediately contact at least one individual from the Breakbulk Conference and speak to him. However, very little else was done to follow up on what was a *second* harassment complaint against Watson. Indeed, Thomas told Lowery that she did not need to do anything further regarding her complaint—such as file a written complaint consistent with company policy. (Hearing Tr. at 143 (Lowery).) And, when Thomas reported the complaint to upper management, they indicated that it merely warranted a note in Watson's file, (Ex. 21), which apparently never happened, (Rademacher Depo. at 48; Hearing Tr. at 307 (Boza)).

Thus, contrary to Sarens' argument, it maintained an outdated sexual harassment policy, failed to provide correct reporting information when a complaint was made, did not formally investigate allegations regarding a repeat offender, and failed to implement recommended measures following a finding of harassment. This response is not consistent with the exercise of reasonable care.

Considering the above, Lowery's failure to report Watson's conduct earlier was reasonable. From her first encounter with Watson, he went out of his way to make the point that his conduct was unlikely to be punished, (*see* Hearing Tr. at 54–55 (Lowery)), and then proved that point when he refused a verbal reprimand for a sustained harassment claim, (Watson Depo. at 34). And, when Lowery finally reported Watson's conduct to Stigter she said that she waited because she did not believe anything would be done. (Hearing Tr. at 70–71 (Lowery).) Instead of allaying that fear, Stigter stated, "I understand." (*Id.*) Lowery's failure to report was therefore reasonable.

### 3.    Conclusion

Based on the foregoing, the Hearing Officer did not clearly err in determining that Sarens was liable for Watson's conduct.

## II.    Lowery's Appeal

Lowery challenges three of the Hearing Officer's decisions: (1) the decision to allow Hussey to testify live via Skype; (2) the conclusion that Lowery was not terminated in retaliation for complaining about Watson; and (3) the award of "only" $50,000 in emotional distress damages. All lack merit. Because the third issue was cross appealed by Sarens, it is discussed in a separate section below.

### A.    Hussey's Testimony

Lowery argues that the Hearing Officer abused her discretion when she allowed Hussey to testify via live Skype feed when the parties had agreed to use his videotaped deposition. The record indicates that the day before the hearing, Sarens discovered that the video recording had been deleted by Skype consistent with Skype's content preservation policy. (Hearing Tr. at 10–13.) While there was a written transcript of the deposition, Sarens sought to allow Hussey to testify live via video feed. (*Id.*) The Hearing Officer agreed, stating, "given what I've learned through the briefing in this case, Mr. Hussey's testimony is necessary for a full and completed record." (*Id.* at 14–15.) But she also admitted his deposition transcript. (*Id.*) The Commission concluded that Lowery was not prejudiced because Lowery was given "the opportunity for cross-examination and impeachment" during the hearing. (Final Agency Decision at 4.)

Lowery insists that she was "blindsided" by Hussey's live testimony and she did not have adequate notice. She argues that "Hussey was permitted to change his testimony on a key issue, which very likely led to the Hearing Officer rejecting Lowery's claim of retaliatory termination." (Doc. 19 at 28.) Lowery's argument hinges on Hussey's reluctant concession during his deposition that while he did not think Watson was involved in Lowery's termination decision, it was "possible" that he was involved. (Hussey Depo. at 28.) During his testimony at the contested hearing, Hussey clarified that Watson had played no role in the decision to

23

terminate Lowery. (Hearing Tr. at 246–47 (Hussey).) When Lowery followed up

on this perceived "inconsistency," Hussey explained:

> I'd like to be more forcible in my assertion that it did not happen earlier.
> I suppose my previous response was me, being the engineer, believing
> that anything could happen, including aliens landing today. But it's not
> the case that that happened earlier, and the decision was made during
> my discussion with Machteld during my meeting in Belgium.

(*Id.* at 262–63.) As argued by Sarens, Hussey had been noticed as a witness and

deposed in the case. And, as the Commission concluded, Lowery had the

opportunity to and ultimately did confront Hussey regarding his deposition. The

Hearing Officer was then able to weigh his response to assess his credibility. The

fact that Lowery liked Hussey's previous answers better is not sufficient grounds

to conclude the Hearing Officer abused her discretion or clearly erred.

## B.    Retaliation

Lowery maintains that her termination was in retaliation for her having

complained about Watson's harassment.[2] To establish a claim for retaliation,

Lowery must present a prima facie case that: (1) she engaged in a protected

activity; (2) thereafter, Sarens took an adverse employment action against her; and

(3) a causal link exists between the two. *Puskas*, 307 P.3d at 306; *Reynaga v.*

*Roseburg Forest Prod.*, 847 F.3d 678, 693 (9th Cir. 2017). The Hearing Officer

---

[2] The Hearing Officer also determined that Lowery's termination was not
discriminatory. (*See* HOD at 26–30.) Lowery does not challenge that conclusion.

determined that the timeline of events was sufficient to support Lowery's prima facie case, but that Sarens successfully rebutted that showing by producing evidence that her termination was part of a legitimate, nondiscriminatory workforce reduction. *Puskas*, 307 P.3d at 306; (HOD at 32–34). The burden therefore fell on Lowery to show pretext. *Id.* The Hearing Officer concluded that Lowery failed to do so, primarily because Watson was not involved in the decision and that "there is no evidence showing that Hussey and Leybaert based their decision to lay Lowery off on anything other than the financial conditions of Sarens at the time." (HOD at 34.)  Lowery's appeal therefore focuses on two issues: (1) Watson's involvement in the termination decision and (2) whether her termination made "business sense." (*See* Doc. 21 at 7.)  Neither argument undermines the Hearing Officer's rejection of Lowery's retaliation claim.

First, Lowery argues that "it is inconceivable that Watson would not have played a role in [her] termination." (Doc. 21 at 5.)  For example, his job description states that country managers are responsible for recruitment and development of management staff. (Ex. 11 at 2.)  Lowery also points out that both she and Rademacher thought that Watson would be involved in her termination decision, (Hearing Tr. at 92–93 (Lowery); Rademacher Depo. at 18), he was involved in the decision to terminate Eggert, (Hearing Tr. at 258 (Hussey)), and he personally delivered Lowery's termination, (*id.* at 250–51 (Hussey)).  Based on

these facts, even Sarens admits that the "optics" of Lowery's termination support her version of events.  However, Hussey testified that despite all appearances and possibilities, Watson was simply not involved in the specific decision to terminate Lowery.  (*Id.* at 243–46.)  Thus, even if this Court were inclined to find differently, the Hearing Officer's conclusion to that effect is supported by substantial evidence.

Second, Lowery argues that because she was a low earner and top performer in the marketing field, it made no sense to terminate her during an economic downturn.  Once again, Lowery's argument is sound as an opening salvo but loses traction considering Sarens' consistent position that her termination was part of a company-wide reduction in workforce, (*see* Ex. 32; Hearing Tr. at 287 (Boza describing other layoffs during that time)), and Hussey's more-specific explanation regarding why her position was redundant, (Hearing Tr. at 245–46 (Hussey)).  *Cf. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (explaining that "shifting" or "conflicting" justifications can be evidence of pretext).  The Hearing Officer did not clearly err by refusing to wade into whether Lowery's termination was the best business decision.  *See id.* (rejecting pretext argument where charging party "presented no evidence that [employer] did not honestly believe its proffered reasons" even if the reason "is foolish or trivial or even baseless" (internal quotation marks omitted)).

26

Based on the foregoing, the Hearing Officer did not clearly err in concluding that Lowery was not terminated in retaliation for her complaint against Watson.

## III.   Damages Award

Both sides challenge the $50,000 emotional distress damages award.  Sarens argues that the award is too high given how much of Lowery's distress was related to her termination, which the Hearing Officer determined was neither retaliatory nor discriminatory.  On the other hand, Lowery argues that the award is too small given the award of $100,000 for emotional distress in other recent cases.  The Hearing Officer found that "Lowery was unhappy in a position she had previously found rewarding" and suffered "difficulties sleeping, feelings of powerlessness, anxiety, and depression."  (HOD at 39.)  However, she declined to award $100,000 for Lowery's distress because (1) there was no physical contact; (2) Lowery did not present evidence of extreme psychological problems; and (3) it did not include distress related to her termination.  (*Id.* at 39–40.)  In doing so, the Hearing Officer addressed the concerns raised by both parties.  The damage award stands.

## IV.   Attorney Fees

The Hearing Officer determined that Lowery was the prevailing party for the purposes of attorney fees under § 49–2–505(8), Mont. Code Ann.  (HOD at 42.)  Accordingly, the determination of a fee award and its amount will be remanded to the agency.

27

**CONCLUSION**

Based on the foregoing, IT IS ORDERED that the agency decision is
AFFIRMED.  The Clerk of Court is directed to enter judgment consistent with this
Order.

IT IS FURTHER ORDERED that the matter of an attorney fee award and
amount for both this proceeding and the proceedings below is REMANDED to the
agency to determine in the first instance.

DATED this 8 day of January, 2021.

_____
Donald W. Molloy, District Judge
United States District Court

28